IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD R. LEACH, | 1:00-cv-06139-LJO-GSA-PC |
| Plaintiff, | FINDINGS AND RECOMMENDATION TO DENY QUALIFIED IMMUNITY ON SUMMARY JUDGMENT |
| vs. | |
| TOM CAREY, T. DREW, D. SCHROEDER, and HAWS, | (Docs. 66, 99) |
| Defendants. | OBJECTIONS, IF ANY, DUE IN TWENTY DAYS |

Plaintiff Donald R. Leach ("plaintiff") is a state prisoner proceeding pro se and in forma pauperis in a civil rights action pursuant to 42 U.S.C. § 1983. Now pending is the defendants' motion for qualified immunity on summary judgment.

**I.     RELEVANT PROCEDURAL HISTORY**

Plaintiff filed the instant action on August 2, 2000. (Court Doc. 1.) This action proceeds on plaintiff's second amended complaint, filed December 2, 2002, against defendants Tom Carey, T. Drew, D. Schroeder, and Haws ("defendants").[1] (Court Doc. 46.) On March 12, 2004, defendants filed a motion for summary judgment. (Court Doc. 66.) On August 23, 2004, the court denied summary judgment on plaintiff's failure to protect claim and on the defense of qualified immunity. (Court Doc.

---

[1] The complaint is entitled "Third Amended Complaint;" however, a review of the record shows it is actually plaintiff's second amended complaint. The original complaint was filed on August 2, 2000, and the first amended complaint was filed on March 12, 2001. (Court Docs. 1, 14.)

1

78.) Summary judgment was granted as to all other claims, leaving only plaintiff's Eighth Amendment failure to protect claim at issue.[2] Id. On interlocutory appeal, the Ninth Circuit found that the district court failed to use the appropriate legal standard to decide the qualified immunity issue and remanded the ruling for reconsideration. (Court Doc. 95 at 5 ¶1.) On April 26, 2007, defendants filed a supplemental motion for summary judgment, addressing the remanded issue. (Court Doc. 99.) On May 25, 2007, plaintiff filed an opposition, and on June 1, 2007, defendants filed a reply to plaintiff's opposition. (Court Docs. 100, 101.)

## II.  PLAINTIFF'S ALLEGATIONS OF FAILURE TO PROTECT

Plaintiff alleges in the second amended complaint that he used to be an active validated member of the Aryan Brotherhood prison gang, but he dropped out of the gang. Plaintiff maintains that once an inmate drops out of a gang he can no longer be housed at any institution or housing unit where active validated members of the prison gang are housed. Plaintiff alleges that defendants were made aware by inmate Steven Fischel on August 2, 1999, that plaintiff was going to be stabbed because plaintiff had dropped out of the gang. Plaintiff alleges that defendants failed to protect him from a physical attack by validated Aryan Brotherhood gang members on August 3, 1999. Plaintiff alleges he suffered disfigurement, physical injury, severe pain, and emotional distress as a result.

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed,

---

[2] By the court's order of August 23, 2004, defendant Lim was dismissed from the action, leaving only defendants Carey, Drew, Schroeder, and Haws. (Court Doc. 78.)

2

summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable

inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

IV.     Statement of Undisputed Facts[3]

1.  Plaintiff was a validated member of the Aryan Brotherhood (AB) gang but was subsequently validated as a gang drop out.

2.  On July 24, 1996, plaintiff was stabbed by another inmate at Pelican Bay State Prison (PBSP) and then placed in administrative segregation because of concerns for his safety, if he remained in the general population.

3.  On March 19, 1998, the institutional classification committee (ICC) for Facility IV-B at CSP- Corcoran.  Plaintiff asked to be placed on the A1 Reintegrated Mix Exercise Yard.  The committee noted that plaintiff was a validated AB dropout, had completed the debriefing process, but noted that he was considered a "regular SHU inmate."  The committee placed him on the B1 Control Compatible Exercise Yard to exercise with White and Southern Hispanic inmates.  Because of plaintiff's dropout status and recent behavior, the committee did not find a "soft" yard warranted at that time.

///

---

[3] Plaintiff filed neither a separate statement of disputed facts nor admitted or denied the facts set forth by defendants as undisputed.  See Local Rule 56-260(b).  Therefore, the court was left to compile the summary of undisputed facts from defendants' statement of undisputed facts and plaintiff's verified complaint.  A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief.  McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); Lew v. Kona Hospital, 754 F.2d 1420, 1423 (9th Cir. 1985); F.R.C.P. 56(e).  Because plaintiff neither submitted his own statement of disputed facts nor addressed defendants' statement of undisputed facts, the court accepts defendants' version of the undisputed facts where plaintiff's verified complaint is not contradictory.

4. On March 31, 1998, a classification services representative (CSR) approved plaintiff's transfer to the California Correctional Institution, Level IV (CCI-IV) based on a confidential chrono dated the same day.

5. On May 28, 1998, plaintiff arrived at CCI-III-Reception Center. While awaiting a bus to take him to CCI-IV A, plaintiff was involved in a fight with another inmate in a holding cage and was placed in administrative segregation.

6. On May 29, 1998, a classification committee saw plaintiff who said that he could program in the general population at CCI-IVA. The committee noted that the other inmate with whom he had fought had been sent to CCI-IVB. The committee referred plaintiff to the Institutional Gang Investigator for evaluation of his current gang status.

7. On Sunday, June 14, 1998, defendant Haws, a correctional lieutenant who was the IGI at the prison, reviewed plaintiff's central file. Lieutenant Haws noted that an August 24, 1987, chrono stated that a polygraph examination of plaintiff had shown him to be deceptive which was attributed to his close association with inmate Wendell "Blue" Norris, a validated AB associate. That chrono also stated that plaintiff had been stabbed by AB members, had nearly died of his wounds, and was in disfavor with the gang. Lieutenant Haws noted that a January 26, 1988, chrono stated that plaintiff had undergone a second polygraph examination which showed truthfulness in response to relevant questions. The author of that memo recommended that plaintiff be considered an AB dropout. A third chrono dated January 10, 1996, validated plaintiff as an AB dropout. Haws concluded that plaintiff's dropout status should not change and recommended his transfer to an institution commensurate with his classification score and gang status, but that his activities should be closely monitored and documented whenever gang activity or involvement was present.

8. On June 17, 1998, a unit classification committee (UCC) did an initial and annual review, reduced his custody level, and placed him on the waiting list for a job in support services.

///

5

9. On May 12, 1999, a classification committee saw plaintiff for annual review and evaluation as to whether he should be transferred to another institution in light of his disciplinary history. The committee referred him to the IGI for a gang status update, noting that he was a validated former AB member and that Sensitive Needs Placement was appropriate. The committee also referred plaintiff to a CSR and recommended that he be transferred to the California Substance Abuse Treatment Facility (C/SATF) or Calipatria IV on an override, noting that Sensitive Needs placement was appropriate because of his gang defector status. Plaintiff agreed with the committee's recommendation.

10. On June 9, 1999, a classification committee, assessing plaintiff's program and housing following review of his suitability for parole by the Board of Prison Terms (BPT), retained plaintiff in his present program pending CSR review and approval of the transfer recommendation.

11. On June 15, 1999, a CSR approved plaintiff's transfer to Calipatria IV for Sensitive Needs Placement.

12. On June 30, 1999, plaintiff was placed in administrative segregation and charged with a disciplinary violation for possession of an inmate-manufactured hypodermic syringe while he was at San Joaquin Community Hospital. He was found guilty of the violation.

13. On July 29, 1999, inmate Fishel learned that plaintiff was going to be stabbed because the AB had information that he was a drop out. Fishel asked another inmate to contact the "security squad" so he could talk to them about it. Leach claims that defendant Schroeder, a correctional officer at the prison, subsequently told Lieutenant Haws who arranged a "debriefing."

14. On August 2, 1999, the IGI received a telephone call from Lieutenant Zanchi, the CCI-IV A SHU Lieutenant. Lieutenant Zanchi said that an inmate had information regarding an assault on an inmate in the CCI-IV A mainline and that the only information they had that it was to happen that day and that the inmate would speak only with the IGI. Later that day, the inmate spoke with defendant Drew from the IGI's staff. Officer Drew did

6

a memo to ISU Capt. Dalton setting forth what he was told. Officer Drew reported that the inmate claimed he had been trying to see the IGI for the past two months and that he wanted to drop out of the AB and would do anything to keep safe. Officer Drew's opinion was that the main reason the inmate wanted to be interviewed was to inform the IGI that he wanted to debrief. He asked the inmate if he had information about an inmate who was going to be assaulted that day. The inmate said he did not know if it would be that day, but it would be "real soon" and that the inmate's name was Leach. Officer Drew asked the inmate who was going to do the assault, but the inmate said he did not know. Officer Drew told the inmate that the debriefing process would not start until further notice and that if the inmate had any other information about staff or inmate assaults, he should tell the IGI. The inmate said he did not have any other information regarding assaults.

After the interview, Drew contacted Sergeant Goodman, the CCI-IV A SHU Sergeant, and told him about the possible assault on plaintiff and that, in his opinion, the inmate informant's main reason for being interviewed was to advise the IGI of his desire to debrief.

The same day, Officer Drew also contacted Lieutenant Prudhomme, the CCI-IV A lieutenant where plaintiff was housed, and told him about the possible assault on plaintiff. Officer Drew told Prudhomme that he had not been able to corroborate the information and that the main reason the inmate informant had wanted to talk to the IGI was to tell the unit that he wanted to debrief.

15. On August 3, 1999, at approximately 2:30 p.m., plaintiff was stabbed by inmate Howerton while they were playing basketball on the main exercise yard.

16. Plaintiff had a one-half inch long by one-half inch deep wound in the left upper back, one and one-half inch long by one-half inch deep wound in the left lateral thigh, a one-quarter to one-half inch stab or puncture wound to the left upper back distal to wound #2, a one-half inch long by one-quarter inch deep wound to the mid back, and a one-quarter inch wound distal to the mid back.

17. On August 12, 1999, plaintiff was transferred to CCI-IV A and placed in administrative segregation pending review to determine his future housing and program needs.

18. On August 19, 1999, a classification committee reviewed plaintiff's administrative segregation placement and noted the June 15, 1999, CSR approval of transfer to Calipatria-IV for Sensitive Needs placement. The committee placed him on a walk alone (W/A) yard and single cell status.

19. On September 16, 1999, a classification committee reviewed plaintiff's placement and noted that he had asked that his transfer to Calipatria-IV be deferred because of a medical hardship which prevented his wife from traveling long distances and to locations below sea level. The committee recommended that the transfer to Calipatria-IV be rescinded and that plaintiff be transferred to SATF-IV for sensitive needs placement based on medical hardship. Plaintiff was retained in administrative segregation on walk-alone status, but was cleared for double-cell housing because of the absence of in-cell misconduct.

20. On October 14, 1999, a classification committee reviewed plaintiff's placement and continued him on walk-alone yard, but returned him to single-cell status.

21. On November 2, 1999, a CSR approved plaintiff for transfer to SATF-IV sensitive needs placement and retention in administrative segregation pending transfer.

22. On November 9, 1999, an ICC continued plaintiff on walk-alone/single-cell status in administrative segregation.

23. On November 15, 1999, plaintiff was transferred to SATF-IV where he is currently housed.

## IV. DISCUSSION

### A. Qualified Immunity on Summary Judgment

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In ruling upon the issue of qualified immunity, the initial inquiry, or first prong, is whether, taken in the light most favorable to the party asserting the

8

injury, the facts alleged show the defendant's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). If, and only if, a violation can be made out, the next step, or second prong, is to ask whether the right was clearly established. Id. In resolving these issues, the court must view the evidence in the light most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff. Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

The first prong of the qualified immunity inquiry is not at issue here. The Ninth Circuit affirmed the district court's determination that plaintiff's allegations, if true, were sufficient to show that defendants' conduct violated plaintiff's constitutional rights under the Eighth Amendment. Therefore, the first prong of the inquiry set forth in Saucier has been met.

As to the second prong, the district court must now reconsider whether the constitutional right was "clearly established." Saucier, 533 U.S. at 201. A particularized inquiry must be made, "undertaken in light of the specific context of the case, not as a broad general proposition . . . ." Id. To determine whether the right was clearly established, the court must determine whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 201-02; Devereaux v. Abbey, 263 F.3d 1070, 1074 (9th Cir. 2001). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Saucier, 533 U.S. at 202. "This is true even if defendants did violate Leach's Eighth Amendment rights." (Jgmt, Leach v. Lowe, 04-16815 at 5 ¶1 (9 Cir. 2006)). "Conversely, where 'various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand,' the officers would not be entitled to qualified immunity." Id. (quoting Saucier, 533 U.S. at 202).

The Ninth Circuit directs us to the particularized inquiry at issue in the present case, "whether, at the time [defendants] were investigating the potential threat to Leach, [defendants] violated a clearly established constitutional right by not immediately and preemptively removing Leach from the general prison population." (Jgmt, Leach 04-16815 at 5 ¶1.) The court must decide "whether there existed any analogous facts, circumstances or authority for the proposition that [defendants] should have reasonably known under the circumstances that they were violating Leach's constitutional rights." Id.; See Hope v. Pelzer, 536 U.S. 730, 739 (2002) (the unlawfulness of a clearly established right must be apparent

from existing authorities); <u>Saucier</u>, 533 U.S. at 202; <u>Kennedy v. City of Ridgefield</u>, 439 F.3d 1055, 1065-66 (9th Cir. 2006).

Under California law in effect since 1980, an inmate who presented a known safety risk was required to be removed from the general population and confined in Administrative Segregation. Title 15 of the California Code of Regulations § 3335(a) states:

> When an inmate's presence in an institution's general inmate population presents an immediate threat to the safety of the inmate or others, endangers institution security or jeopardizes the integrity of an investigation of an alleged serious misconduct or criminal activity, the inmate shall be immediately removed from general population and be placed in administrative segregation. Administrative segregation may be accomplished by confinement in a designated segregation unit or, in an emergency, to any single cell unit capable of providing secure segregation.

15 CA ADC §3335(a).

In case law, the court looks first to precedent which is binding in the Ninth Circuit and which existed at the time defendants were investigating the threat against Leach on August 2, 1999. Defendants agree that, as a general proposition, the law was clearly established that, if an officer knows of an excessive risk to an inmate's safety and infers from the facts of which he was aware that a substantial risk of harm exists, he would violate the Eighth Amendment by disregarding it or not reasonably responding to it. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994).

In <u>Williams v. Field</u>, 416 F.2d 483 (9th Cir. 1969), the Ninth Circuit held that prison officials' conduct was not cruel and unusual punishment when they did not "lock up" an inmate to protect him, even though they knew the inmate had lodged a complaint concerning a "threat made against his life" by fellow inmate John Carrello. Carrello told officials [about plaintiff], "You had better lock him up, because I am going to get him." On the following day Carrello threw a pitcher of scalding hot coffee into plaintiff's face and beat him with the empty coffee pot. The court held that the officials' conduct did not "shock the conscience or violate fundamental fairness," and the punishment did not go "beyond legitimate penal aims."

In <u>U.S. v. Tolias</u>, 548 F.2d 277 (9th Cir. 1977), the Ninth Circuit held that the fact that defendant was an admitted homosexual did not make a sentence of five years' imprisonment cruel and unusual punishment, even though assaults and homosexual rapes occurred in prisons. According

///

to the court, the test for cruel and unusual punishment was whether the penalty is so out of proportion to the crime committed that it shocks a balanced sense of justice.

In Hoptowit v. Ray, 682 F.2d 1237 (9th Cir. 1982), the Ninth Circuit held that various state officials were deliberately indifferent when they failed to reduce the level of violence at a penitentiary at which eight inmates and two guards were killed, there was a "potentially explosive" atmosphere with a high level of violence caused by overcrowding and other conditions, guard brutality was the norm, and there was an inadequate grievance system.

In Osolinski v. Kane, 92 F. 3d 934 (9th Cir. 1996), the Ninth Circuit held that prison officials were not deliberately indifferent to an inmate's safety when they failed to maintain an oven in the facility's family visiting unit, and the oven door fell off its hinges, causing second degree burns to inmate's forearm.

None of the Ninth Circuit cases cited above is similar to the case at hand in both facts and law. The facts in Williams are the most similar, because defendants Carey, Haws, Drew, and Schroeder, as the defendants in Williams, knew about a threat made by one inmate against another and failed to act before the threat was carried out. However, the law defining cruel and unusual punishment changed between Williams in 1969 and Leach's attack in 1999. The test used in Williams to establish cruel and unusual punishment was whether the conduct "shocked the conscience." By 1999, the test used was whether the conduct showed "deliberate indifference." Farmer, 511 U.S. at 834. It follows that the Ninth Circuit rulings noted above cannot be said to have put defendants on notice that their conduct in Leach's situation would be unlawful.

Absent binding precedent, the court looks to all available decisional law, including the law of other circuits and district courts, to determine whether the law was clearly established. Osolinski, 92 F.3d at 936. The court next turns to rulings of district courts in the Ninth Circuit. In Capps v. Atiyeh, 559 F.Supp. 894 (D.C. Or. 1983), the court concluded that the level of violence at the prison, which had risen with the prison population and included assaults, fights, self-mutilations, and group disturbances, did not warrant the inference that the state was deliberately indifferent to the inmates' safety.

///

1      In <u>Balla v. Idaho State Bd. Of Corrections</u>, 595 F.Supp. 1558 (D.C. Idaho 1984), the court
2  was unwilling to find that involuntary double celling, which had a direct correlation with the level of
3  violence in medium custody, was unconstitutional on personal safety grounds.
4      In <u>Madrid v. Gomez</u>, 889 F.Supp. 1146 (N.D. Cal. 1995), the court held that prison officials
5  were not deliberately indifferent to inmate safety when they failed to consider prior assaultive
6  behavior in making cell assignments, because it was not clear that defendants knew the parameters of
7  the problem.
8      The court now turns to the law of other circuits.  In <u>Taylor v. Michigan Dept. of Corrections</u>,
9  69 F.3d 76 (6th Cir. 1995), the court found that evidence was sufficient to warrant trial against a
10 warden who delegated responsibility over prison transfers to subordinates, knew subordinates were
11 approving transfers without adequate reviewing inmate records, knew there were widespread sexual
12 assaults, knew that small, youthful prisoners were vulnerable to sexual pressure, and information in
13 plaintiff's file would have disclosed that he was a vulnerable prisoner when he was transferred to
14 dangerous camp.
15     In <u>Haley v. Gross</u>, 86 F.3d 630 (7th Cir. 1996), the court held that plaintiff is not required to
16 prove that a prison official acted or failed to act believing that harm actually would befall an inmate,
17 but only to show that the official had knowledge of a substantial risk of serious harm.
18     Defendants cite rulings from jurisdictions other than the Ninth Circuit that excuse prison
19 officials, in particular situations, from providing protective housing to inmates who may be under
20 threat of assault.  Defendants also cite rulings from other jurisdictions granting qualified immunity to
21 prison officials who reported threats of assaults to supervising officers, as Schroeder did, or who
22 investigated threats or referred them to proper authorities for investigation, as Drew and Haws did.
23 Defendants argue that at the time of the investigation, courts had not found that the Eighth
24 Amendment required prison officials to place a prisoner in protective custody while they investigated
25 unconfirmed information of a threat to the inmate's safety.  It is clear that such a decision would
26 have placed defendants on notice that their conduct was unlawful.  However,  even assuming for
27 discussion that no such decision was made, this does not prove that defendants were <u>not</u> on notice.
28 The Supreme Court held that for purposes of qualified immunity, officials can still be on notice that

their conduct violates established law even in novel factual circumstances, as notice does not require that facts of previous cases be materially or fundamentally similar to the situation in question. Hope 536 U.S. at 741. In fact, the court expressly rejected a requirement that previous cases be "fundamentally similar" and found that "cases with 'materially similar' facts" are not necessary to find that "the law is clearly established." Id. That same year, the Ninth Circuit stated that "[N]either Farmer nor subsequent authorities has fleshed out 'at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes.'" Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1051 (9th Cir. 2002).

Viewing the facts in the light most favorable to plaintiff, the court finds that a reasonable officer in defendants' shoes, knowing what defendants knew, could not have mistakenly but reasonably perceived that releasing Leach unprotected onto the main exercise yard while they conducted an investigation was not unlawful. Plaintiff alleges that defendants were aware that someone was planning to attack him, and they failed to remove him from the main yard, thereby subjecting him to the assault. The facts are undisputed that by August 2, 1999, officers were aware of a report by an inmate informant that another inmate had threatened to stab Leach, "real soon." Drew, who interviewed the informant on August 2, 1999, took the information but questioned the informant's credibility. Drew believed the informant's main reason for speaking out was to inform the IGI that he wanted to debrief. Drew reviewed Leach's file but could not corraborate the informant's story. Drew did a memo to ISU Capt. Dalton setting forth what he was told by the informant. Drew then reported to Sergeant Goodman, Lieutenant Prudhomme about the threatened assault and shared his opinion that the informant lacked credibility. Lieutenant Prudhomme was planning to interview plaintiff to determine whether the threat was credible enough to warrant protective housing or some other protective measure, but the interview did not take place that day.

Defendants knew about Leach's background and classification. Leach's prison file showed that he was an at-risk inmate who had needed protection before. Leach had been stabbed by another inmate at Pelican Bay State Prison in 1996 and placed in administrative segregation out of concerns for his safety if he remained in the general population. Leach had been a member of the Aryan Brotherhood prison gang, but was now validated as a drop out from the gang and classified as a

"sensitive needs placement" inmate who needed protection. In June 1998, defendant Haws reviewed Leach's file, which documented that in 1987 Leach had been stabbed by AB gang members, had nearly died from his wounds, and was in disfavor with the gang. Haws concluded that plaintiff's dropout status should not change and recommended his transfer to an institution commensurate with his classification score and gang status. Haws also concluded that Leach's activities should be closely monitored and documented whenever gang activity or involvement was present. In mid-June 1999, a Classification Services Representative approved Leach to be transferred from CCI to another institution and placed on a Sensitive Needs yard because of his disciplinary history and gang status. By August 3, 1999, Leach had not been transferred, and Lt. Prudhomme had not interviewed Leach about the informant's story.

Even if a reasonable officer would have shared Drew's opinion that the informant was not credible or the information about the planned assault was not clear, he still would have understood that Leach could be in danger. A reasonable officer in defendants' shoes would know that Leach was a validated drop out from the AB prison gang. A reasonable officer, knowing Leach's background and knowing that Leach was specifically named as the potential victim of a stabbing that would happen "real soon," would know that Leach may need protection to prevent serious injury. A reasonable officer would know that any inmate who is a validated drop out from a dangerous prison gang could be in immediate danger if placed in a recreation yard with members of the gang. A reasonable officer would understand that Leach had enemies; that it was possible the informant's report was true; that a stabbing could occur as early as that day; and that Leach should be protected from harm. As previously stated, the law was already established in 1999 that "if an officer knows of an excessive risk to an inmate's safety and infers from the facts of which he was aware that a substantial risk of harm exists, he would violate the Eighth Amendment by disregarding it or not reasonably responding to it."

Based on the foregoing and viewed in the light most favorable to plaintiff, the court finds that it would have been clear to reasonable officers in defendants' shoes that failing to remove Leach from the main yard when they had information that another inmate was planning to attack Leach "real soon," would pose a substantial risk of serious harm. A reasonable officer would find it

unacceptable under constitutional law to release an at-risk inmate into the recreation yard while an investigation was pending <u>to determine whether</u> the inmate should be released into the recreation yard. Accordingly, the court finds that defendants are not entitled to qualified immunity and recommends that defendants' motion for qualified immunity on summary judgment be denied.

## V. CONCLUSION AND RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. Defendants' motion for qualified immunity on summary judgment be DENIED; and
2. This action now proceed only on plaintiff's Eighth Amendment failure to protect claim against defendants Tom Carey, T. Drew, D. Schroeder, and Haws.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty (20) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(c). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   January 31, 2008**              /s/ **Gary S. Austin**
                                        UNITED STATES MAGISTRATE JUDGE